IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALFREDO DOMENECH and IVAN SERRANO | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 06-1325 |
| | : | |
| CITY OF PHILADELPHIA, ET AL. | : | |

SURRICK, J.                                                              APRIL   23 , 2009

<u>MEMORANDUM</u>

Presently before the Court is Defendants Leon Lubiejewski and the City of Philadelphia's

Motion for Summary Judgment.  (Doc. No. 23.)  For the following reasons, the Motion will be

granted.

I.    **FACTUAL BACKGROUND**[1]

Alfredo Domenech and Ivan Serrano ("Plaintiffs") brought this action alleging that they

spent 18 years in prison for a murder that they did not commit.  They allege that Philadelphia

County, its prosecutors, and its detectives withheld exculpatory evidence that would have proved

their innocence at a 1988 murder trial in which a jury found them guilty.  In October 2005, a

Pennsylvania state court granted Plaintiffs a new trial following the discovery of new evidence.

Plaintiffs were released from prison in 2005 after the Philadelphia District Attorney's office

decided not to prosecute the case.  (Stipulation, Dec. 10, 2007, ¶ VI.)

On March 28, 2006, Plaintiffs brought the instant action claiming that their convictions

were obtained in violation of state and federal law.  This case hinges on what the police and the

---

[1] In reciting the factual background, all facts and inferences are drawn in favor of
Plaintiffs as the nonmoving party.  *See Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007)
(noting that when deciding a motion for summary judgment, the court "must view the facts in the
light most favorable to the nonmoving party and draw all inferences in that party's favor").

prosecutors knew in arresting Plaintiffs and in prosecuting them for murder.[2]

### A.    The Murder of Juan Martinez

On May 27, 1987, Juan Martinez ("Martinez") was fatally shot near the corner of Front and Diamond Streets in Philadelphia.  (Doc. No. 23-2 ¶ 1.)  In the immediate aftermath of the shooting, Philadelphia Police identified two eyewitnesses who became the focus of the investigation.  The first eyewitness was Renee Thompson ("Thompson"), a prostitute who routinely observed vehicles in the area to determine if there were men inside.  (Doc. No. 23, Ex. 19 at 18.)  Thompson told police that she was standing at the corner of Front and Diamond Streets when she heard a car pull up on Front Street.  (*Id.*, Ex. 3.)  She walked onto the sidewalk and saw Martinez jump out of a brown Ford Pinto.[3]  (*Id.*)  A blue car with a white roof then

_____

[2] In addition to their summary judgment motion, Defendants filed Defendants' Statement of Undisputed Facts.  (Doc. No. 23-2.)  This statement consists of 209 numbered paragraphs, each of which contains facts that Defendants support with citations to the record where the facts can be found.  Plaintiffs filed a Response in Opposition to Defendants' Statement of Undisputed Facts.  (Doc. No. 25.)  Plaintiffs object to many of the facts proffered by Defendants by indicating that they are "denied" and providing a brief explanation.  Very few of Plaintiffs' denials are supported with citations to the record.  Denials of proposed findings of fact that lack evidentiary substantiation are treated as admissions.  *See* Fed. R. Civ. P. 56(e)(2) ("[A]n opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."); *Olympic Junior, Inc., v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972) ("Conclusory statements, general denials, and factual allegations not based on personal knowledge would be insufficient to avoid summary judgment") (citations omitted); *Hyland v. Am. Gen. Life Co.*, No. 06-6155, 2008 WL 4308219, at *1 n.1 (D.N.J. Sept. 17, 2008) ("[T]he Court considers those of Defendant's statements that Plaintiff has denied without citation to the record, or denied without creating a genuine dispute as to material facts, to be admitted.").  Where Plaintiffs cite to evidence in the record to challenge one of Defendants' undisputed facts, we discuss the challenge in a footnote.

[3] Defendants cite Thompson's statement to the police in support of the fact that "Thompson stepped out onto the sidewalk and saw the decedent jump out of a brown Ford Pinto."  (Doc. No. 23-2 ¶ 4; *id.*, Ex. 3.)  Plaintiffs deny the fact "as stated" on grounds that Thompson's written statements "are not established facts where they are made *ex parte*, were not

approached the Pinto.  (*Id.*)  Thompson told police that Martinez began to argue with a person in

the blue car with the white roof.[4]  (*Id.*)  A passenger in the car reached out and fired a single shot

at Martinez, who fell to the ground.  (*Id.*)  Thompson told police that the car sped away down

Front Street towards Girard Avenue, bringing it directly in front of her and providing her with a

view of the occupants.  (*Id.*, Exs. 3, 5.)  She reported seeing two Hispanic male occupants, one of

whom had curly hair.  (*Id.*, Exs. 3, 5, 19.)  Thompson ran for help and found Police Officer Sonia

---

under oath, and raise issues of her credibility and ability to observe."  (Doc. No. 25 ¶ 4.)
Plaintiffs cite "Exhibit 'A'. P. 2" in support of their objection.  (*Id.*)  Exhibit A is the deposition
of Plaintiff Domenech's criminal trial counsel, and page two is a cover sheet.  (*See id.*, Ex. A.)
We assume that Plaintiffs intended to cite Thompson's witness statement, which was not
appended to Plaintiffs' opposition brief.

      Plaintiffs' objection is without merit.  One of the major issues in this case is whether
there was probable cause to prosecute the charges against Plaintiffs.  This, of course, depends on
what the authorities knew, not whether a witness was credible or had the ability to observe.
Thompson's statement to police establishes what the police were told.  The statement is
admissible evidence at trial to establish probable cause.  *See Williams v. Borough of W. Chester*,
891 F.3d 458, 466 n.12 (3d Cir. 1989) ("[W]hat is produced at the summary judgment stage must
set forth evidence 'as would be admissible' at trial, Fed. R. Civ. P. 56(e), and thus must be
'reduc[ible] to admissible evidence.'" (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 327
(1986))).  The statement presents no hearsay problem because it is not offered for the truth of the
matter asserted.  *See* Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the
declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the
matter asserted.").  Rather, it is offered to show what the police knew based on what Thompson
told them.

     [4] Defendants' proposed finding of fact states that "Thompson . . . heard the passenger side
occupant in the blue car start arguing, in Spanish, with [Martinez], who was standing on the
sidewalk."  (Doc. No. 23-2 ¶ 6.)  Defendants cite Thompson's statement to the police.  (*See* Doc.
No. 23, Ex. 3.)  Plaintiffs object that "Thompson does not speak Spanish, and does not know if
they were arguing or not."  (Doc. No. 25 ¶ 6.)  Plaintiffs contend that "[Thompson] only saw the
decedent speaking with two males in a blue car that had white on it."  (*Id.*)  Plaintiffs' objection
is misplaced as it is not directed at what Thompson told the police, which is the relevant inquiry.
Moreover, to the extent that Plaintiffs' objection is relevant, we note that one need not
necessarily speak Spanish to detect an argument between two individuals who are speaking
Spanish.  Thompson's statement establishes that she told police that the decedent was arguing
with the occupants of the car and that they were speaking Spanish.  (Doc. No. 23, Ex. 3.)

Neris ("Officer Neris") at the intersection of Front and Susquehanna Streets.  (*Id.*, Ex. 3.)

Thompson described the foregoing events to Officer Neris and to another Police Officer, Joseph

Carolan.  (*Id.*, Exs. 3, 5, 6.)

The second eyewitness was Anthony Pescatore ("Pescatore"), a bystander who was at the

corner of Front and Berks Streets when he heard a noise that he believed was a vehicle

backfiring.  (*Id.*, Ex. 4.)  Pescatore saw a blue vehicle with two male passengers drive past him

down Front Street.  (*Id.*)  While he was near the crime scene reporting his observation to Officer

Neris, Plaintiffs were approaching the scene in a 1974 Plymouth Scamp.  (*Id.*, Exs. 3, 4, 5.)  The

Plymouth Scamp was white over blue.  (*Id.*)  Thompson saw the Plymouth from the back of

Officer Neris's patrol car, pointed at it, and exclaimed "that's the guys, they're the ones that shot

him."  (*Id.*, Ex. 5.)  At the same moment, Pescatore yelled to the police "there goes the car."  (*Id.*,

Ex. 4.)

Officer Neris radioed for backup and the Plymouth was promptly stopped nearby.  (*Id.*,

Ex. 5.)  Officers Neris, Carolan, and James Kirk approached the Plymouth and ordered Plaintiffs

to exit.  (*Id.*)  Plaintiff Domenech was seated in the driver's seat and Plaintiff Serano was seated

in the passenger seat.  (*Id.*)  Thompson told the police that Plaintiffs had switched positions in the

vehicle from the time that she saw them shoot Martinez.  (*Id.*, Ex. 3.)  Thompson identified

Plaintiff Domenech as the shooter based on his curly hair.  (*Id.*)

Plaintiffs were taken into custody at approximately 3:25 a.m. on May 29, 1987, and

Defendant Lubiejewski was assigned to investigate the murder.  (*Id.*, Ex. 6; *id.*, Ex. 22 at 71.)

At approximately 6:00 a.m., Defendant Lubiejewski spoke with Assistant District Attorney

Charles Gallagher, who instructed Defendant Lubiejewski to charge Plaintiffs with murder,

4

conspiracy, and possession of an instrument of crime.  (*Id.*, Ex. 12.)  Defendant Lubiejewski

prepared a document known as a Complaint Fact Record that contained, among other things, the

eyewitness statements from Thompson and Pescatore.  (*Id.*, Exs. 33, 34; *id.*, Ex. 22 at 73-75.)

The Complaint Fact Record was sent to the District Attorney's Office for review and approval of

the charges.  (Doc. No. 23, Ex. 22 at 71-77.)

Defendant Lubiejewski was assigned to the murder investigation for seven days, from

May 29 to June 5, 1987.  During this time, he and a team of detectives interviewed at least 13

people including Martinez's sister, Hilda Maran ("Maran"), and his brother, Raymond Martinez

("Raymond").  (*Id.* ¶ 40 n.3; *id.*, Exs. 9-10, 13, 31, 32.)  Maran told the detectives that Martinez

used to deal drugs for two individuals known as "Placedo" and "Jesuico."  (Doc. No. 23, Ex. 9.)

Maran did not know their real names.  (*Id.*)  She told police that several years earlier Martinez

had a disagreement with Placedo and Jesuico and they threatened to kill him.  (*Id.*)  Maran stated

that because of this threat, Martinez left Philadelphia for Puerto Rico in November 1984.  (*Id.*)

She stated that Martinez returned to Philadelphia in October 1986 and had since re-established

contact with Placedo and Jesuico.  (*Id.*)  She further stated that the week before the murder,

Martinez purchased a car from Jesuico, who told Martinez that he could resume dealing drugs for

him.  (*Id.*)  Maran was not aware of any threats made against Martinez since he returned to

Philadelphia in October 1986.  (*Id.*)  The detectives showed Maran photographs of Plaintiffs, and

she stated that the individuals in the photographs were too young to be Placedo and Jesuico.  (*Id.*

("Placedo and Jesuico are both older guys.  They are just young boys that you have."))

Raymond told the detectives that he was aware that Martinez had fled to Puerto Rico

several years earlier because of a dispute over drugs but did not know that Martinez had any

5

current problems with anyone.  (*Id.*, Ex. 10.)  Raymond said that he knew Placedo and Jesuico,

although he did not know their real names, and said that Martinez was not afraid of them.  (*Id.*)

He said that Placedo drove a red, four-door Chevrolet Chevette and Jesuico drove a burgundy

Toyota SR5.  (*Id.*)  At a follow-up interview on May 30, 1987, Raymond told Defendant

Lubiejewski and Detective Dougherty that Martinez's cousin, Cesario Sanchez ("Sanchez"), told

him that he was with Martinez at a bar, the Playpen Lounge, on the night of the murder.  (*Id.*, Ex.

13.)  Raymond reported that Sanchez told him that Martinez was arguing with two men over a

game of pool while at the Playpen Lounge.[5]  (*Id.*)  Raymond provided the detectives with

Sanchez's home address.  (*Id.*)

On June 2, 1987, Defendant Lubiejewski and Detective Dougherty met with Sanchez.

(Doc. No. 23, Exs. 13-15.)  Sanchez stated that on the night of the murder, he was with Martinez

---

[5] Defendants' proposed finding of fact states that "[Raymond] also told the detectives that he learned from . . . Sanchez that [Martinez] had gotten into an argument with two guys at the Playpen Lounge over a pool game."  (Doc. No. 23-2 ¶ 74.)  Defendants cite the Homicide Unit's Activity Sheet for May 30, 1987.  (*See* Doc. No. 23, Ex. 13.)  Plaintiffs respond that the fact is "[a]dmitted in part and denied in part" because:

> Plaintiffs have no way of knowing what this witness stated because there is no separate witness statement to that effect by this witness.  By way of further response Cesario Sanchez gave this witness information about [Martinez] getting into an argument with two guys at the Playpen Lounge.  Additionally and by way of further answer Plaintiffs were not at the Playpen Lounge.

(Doc. No. 25 ¶ 674.)  Plaintiffs cite the deposition of Plaintiff Domenech.  (Doc. No. 25, Ex. C.)
The Homicide Unit's Activity Sheet is a public record pursuant to Federal Rule of Evidence 803(8).  It is admissible evidence at trial and therefore appropriate to consider on a motion for summary judgment.  *See Williams*, 891 at 466 n.12 ("[W]hat is produced at the summary judgment stage . . . must be 'reduc[ible] to admissible evidence.'") (citation omitted).  Plaintiffs challenge whether Sanchez actually told Raymond about the incident at the Playpen Lounge, as reported to police.  The issue is what the police were told, not whether Sanchez actually made the statements or whether the statements were true.  There is no hearsay problem.

6

at the Playpen Lounge along with Antonio Ortiz ("Ortiz") and a man named "Tito." (*Id.*, Ex. 7.) When the bar closed, all four men went to the home of Enrique Vicente, known as "Mayaguez," at 2128 North Front Street. (*Id.*) Sanchez stated that he went inside the house to find Mayaguez while Martinez, Ortiz, and Tito waited outside. (*Id.*) He further stated that when he reached the second floor, he heard a gun shot outside, ran to the window, and saw Martinez wounded on the sidewalk. (*Id.*) Sanchez indicated that he fled the scene.[6] (*Id.*)

Detectives located Tito, whose actual name is Edwin Rohena. (*Id.*, Ex.'s 7-11.) Rohena denied being present at the murder scene on the night in question. (*Id.*, Ex. 11.) He said that he had no information about Martinez's murder. (*Id.*) Detectives then tried to speak with Ortiz. On June 2, 1987, detectives went with Sanchez to Ortiz's residence. (*Id.*, Ex. 15.) When they knocked on the door, a man who Detective Lubiejewski believed to be Ortiz looked out the third floor window and said that he would come down.[7] (*Id.*) Instead, the man fled from the back of

---

[6] In 2002, Magistrate Judge M. Faith Angell held an evidentiary hearing related to a habeas corpus petition filed by Plaintiff Domenech during which Sanchez testified that he had lied to police about the murder. (*See* Doc. No. 23-2 at 16 n.4; Hr'g Tr., Doc. No. 23, Ex. 37 at 42-50.) Sanchez testified before Magistrate Judge Angell that on the night of the murder, he was inside the apartment building when he heard Martinez get into a verbal altercation with Mayaguez and a man named "Principe." (*Id.*) He testified that he heard gun shots, looked out the window, and saw Martinez wounded on the ground. (*Id.*) He heard Mayaguez and Principe coming up the stairway and fled the apartment building. (*Id.*) Sanchez testified that he did not tell the truth to the detectives in 1987 because he feared for his life. (*Id.*) He also testified that the information he provided about Tito being present at the murder scene was not accurate. (*Id.*)

[7] Defendants' proposed finding of fact states that "[u]pon arriving at 519 W. Diamond Street, the detectives had Sanchez knock on the front door, whereupon . . . Ortiz looked out the third floor window and said that he would be right down." (Doc. No. 23-2 ¶ 99.) They cite the Homicide Unit's Activity Sheet for June 2, 1987. (*See* Doc. No. 23, Ex. 15.) Plaintiffs respond that this fact is "[d]enied as stated" because:

> Plaintiff has no way of knowing that the detectives knock [sic] on the door and then fled. Information recorded on activity sheets is *ex-parte* and raises issues of

the house.[8]  (*Id.*)  Defendant Lubiejewski ran a background check on Ortiz after the incident and

discovered that he had an outstanding bench warrant in an unrelated matter.  (*Id.*, Ex. 22 at 97-

98.)  On June 5, 1987, Detective Lubiejewski was assigned to a different unit and was no longer

responsible for investigating the murder.[9]  (*Id.*, Ex. 22 at 69-71; *id.*, Ex. 35; *id.*, Ex. 26 at 15-

16.)[10]

---

    credibility.  By way of further answer Defendant Lubiejewski testified that when he
    went to Antonio Ortiz [sic] home he did not have a photo of . . . Ortiz.

(Doc. No. 25 ¶ 99.)  Plaintiffs cite the deposition of Defendant Lubiejewski.  (*Id.*, Ex. D at 98.)
    For the reasons already mentioned, the Activity Sheet is admissible evidence at trial and
is therefore appropriate to consider at the summary judgment stage.  *See* Fed. R. Evid.  803(8)
(public records exception).  The Activity Sheet is evidence that a man who Defendant
Lubiejewski and Detective Dougherty believed to be Ortiz came to the window and announced
his intention to come to the door.  Plaintiffs point to no evidence that disputes this fact.

    [8] Defendants' proposed finding of fact states that "[w]hen Detectives Dougherty and
Lubiejewski approached the front door with . . . Sanchez, Ortiz looked out the front door
window, saw the detectives, and fled out the back of the house, eluding detectives."  (Doc. No.
23-2 ¶ 100.)  They cite the Homicide Unit's Activity Sheet for June 2, 1987.  (*See* Doc. No. 23,
Ex. 15.)  Plaintiffs respond that this fact is "[d]enied as stated" because "[s]tatements made by
Defendant Lubiejewski during a deposition contradicted what is in the activity sheet in that at the
deposition it was stated that Ortiz ran out the back door."  (Doc. No. 25 ¶ 100.)  Plaintiffs cite the
deposition of Defendant Lubiejewski.  (Doc. No. 25, Ex. D at 98.)
    The Activity Sheet is admissible evidence.  *See* Fed. R. Evid. 803(8) (public records
exception).  Contrary to Plaintiffs' representation, the Activity Sheet for June 2, 1987, and
Detective Lubiejewski's deposition testimony are in complete accord regarding the fact that the
man believed to be Ortiz fled out the back door.

    [9] Defendants' proposed finding of fact states that "[o]n June 5, 1987, three days after his
attempt to interview . . . Ortiz, Detective Lubiejewski, along with six (6) other Homicide
Detectives, was reassigned to a unit outside the Homicide Unit."  (Doc. No. 23-2 ¶ 103.)  They
cite deposition testimony from Defendant Lubiejewski.  (*See id.*, Ex. 22 at 68-71.)  Plaintiffs
respond that it is "[a]dmitted only that Defendant Lubiejewski was reassigned" and contend that
the reassignment "is entirely irrelevant."  (Doc. No. 25 ¶ 103.)  Plaintiffs' admission is sufficient
to make the fact of the reassignment undisputed.

    [10] Defendants' proposed finding of fact states that "[o]nce Detective Lubiejewski was
reassigned out of the Homicide Unit, he no longer was responsible for conducting any further

On June 25, 1987, a preliminary hearing was held in the Municipal Court of Philadelphia. (Doc. No. 23, Ex. 16 at 26.)  The court found a *prima facie* case and ordered Defendants held for trial.  (*Id.*)  Defense counsel was provided with discovery documents including witness statements and police statements.[11]  (*Id.*, Ex. 24 at 27.)  Included in these documents was the

---

investigation in the . . . Martinez murder case." (Doc. No. 23-2 ¶ 99.)  They cite the deposition testimony of Lt. James Henwood.  (*See* Doc. No. 23, Ex. 26 at 15-16.)  Plaintiffs respond that the fact is "[d]enied" because:

> Plaintiffs have no way of knowing what Detective Lubiejewski's duties were with regards to this homicide investigation once he was reassigned.  By way of further response Plaintiffs' [sic] contends [sic] that Defendant Lubiejewski had an obligation to inform his supervisors of the status of a Homicide investigation and the need for further investigation since he had independent information, although not noted on the activity sheets, that Antonio Ortiz, the witness he tried to see on June 2, 1987, could provide exculpatory information.

(Doc. No. 25 ¶ 105.)  Plaintiffs cite "Exhibit F, Activity Sheet for June 2, 1987, and Exhibit G, Cesario Sanchez Statement, June 2, 1987." (*Id.*)  Plaintiffs' Exhibit F, appended to Doc. No. 25, is the Activity Sheet for May 29, 1987, not June 2, 1987.  If Plaintiffs wished to dispute this proposed fact and determined that they had "no way of knowing what Detective Lubiejewski's duties were with regards to this homicide investigation" following reassignment, it was their obligation to develop competent factual evidence during the discovery period to create a factual dispute.  They have not done so.  We have reviewed Lieutenant Henwood's deposition testimony and find that it establishes that Detective Lubiejewski had no responsibility for investigating Martinez's murder from June 5, 1987, until he was ordered to take a statement form Ortiz on March 27, 1988.  (*See* Doc. No. 23, Ex. 22 at 123-24.)

[11] Defendants' proposed finding of fact states that "[i]t is undisputed that defense counsel received discovery documents from A.D.A. Rubino prior to trial, including witness statements, police statements, medical reports and forensic reports." (Doc. No. 23-2 ¶ 113.)  They cite the deposition testimony of Plaintiff Domenech's trial counsel, Mr. McGlaughlin.  (*See* Doc. No. 23, Ex. 24 at 27.)  Plaintiffs respond that this fact is "[a]dmitted in part and [d]enied in part." because:

> It is admitted that Plaintiffs' Defense counsels [sic] received some discovery materials from the Commonwealth.  It is denied that those discovery materials were accurate or complete.  By way of further response, Plaintiffs lawyers [sic] in their criminal case stated that they did not get the statement of Hilda Maran and that they did not get activities sheets.

witness statement of Sanchez.  (*Id.*, Ex. 24 at 32.)  Trial was held between March 23 and March 28, 1988.  (*Id.*, Exs. 17, 21.)

Plaintiffs' trial counsel testified at depositions in this case that they do not believe they were provided with Maran's statement.  (Doc. No. 25, Ex. A at 22; *id.*, Ex. B at 10.)  The record does not indicate whether Maran's statement was provided to Plaintiffs' trial counsel before trial.  (*See* Doc. No 23, Ex. 22 at 32-40; Doc. No. 25, Ex. 24 at 29; *id.*, Ex. 23 at 41-42.)  The record is similarly unclear as to whether any police Activity Sheets were provided to Plaintiffs' trial counsel in discovery.  (Doc. No. 25, Ex. 24 at 22; *id.*, Ex. 23 at 10.)  It is evident from the record, however, that Plaintiffs' trial counsel were aware of Ortiz and that he was a potentially important witness for their clients.  Plaintiffs' trial counsel had access to Sanchez's witness statement, which contained Ortiz's name and address.  (Doc. No. 23, Ex. 7; *id.*, Ex. 24 at 32.)[12]  Plaintiffs'

_____

(Doc. No. 25 ¶ 113.)  Plaintiffs cite the deposition testimony of Plaintiffs' criminal trial counsel, Messrs. McGlaughlin and Gelman (Doc. No 23, Exs. 23, 24.)  We have reviewed the deposition transcripts.  The transcripts contain unrebutted testimony that supports a finding that Plaintiffs' counsel received discovery material from the District Attorney's Office before trial and that the discovery material included statements from some police officers and some witnesses.  (*Id.*, Ex. 23 at 32; *id.*, Ex. 24 at 27-29.)  We find no evidence in the record to support a finding that the pretrial disclosures contained medical and forensic reports.

[12] Defendants' proposed finding of fact states that "[i]t is undisputed that prior to trial, defense counsel was made aware of the existence of . . . Ortiz as a possible witness, as his name and address was revealed in the written statement of . . . Sanchez."  (Doc. No. 23-2 ¶ 121.)  They cite deposition testimony of Plaintiff Domenech's trial counsel, Mr. McGlaughlin.  (*See* Doc. No. 23; *id.*, Ex. 24 at 27.)  Plaintiffs respond that this fact is "[d]enied as stated" because "McLaughlin [sic] did not recall . . . Ortiz and his address being referenced in . . . Sanchez' statement."  (Doc. No. 25 ¶ 121.)  Plaintiffs also cite McGlaughlin's testimony that he did not recall Ortiz being named in Sanchez's statement.  (Doc. No. 23, Ex. 24 at 32.)  We have reviewed McGlaughlin's deposition testimony and find that he unambiguously testified that he received Sanchez's statement "well before trial."  (*Id.* ("Q: [Y]ou had the statement of . . . Sanchez, in discovery?  A:  I did, I had that well before trial").)  This testimony and the contents of Sanchez's statement are sufficient to support a finding that Plaintiffs' trial counsel had access

trial counsel also retained a private investigator who attempted to locate Ortiz.  (Doc. No 23, Ex. 24 at 32.)  During trial, Ortiz was apprehended on charges unrelated to Plaintiffs' criminal trial and the District Attorney was made aware of his being in custody.  (Doc. No. 23, Ex. 24 at 4; *id.*, Ex. 36 at 66-84.)  Given this new development, court was adjourned while the District Attorney investigated the potentially exculpatory information that Ortiz possessed.  (*Id.*)  Ortiz's statement, which was taken by Detective Lubiejewski, was exculpatory and suggested that the murder was committed by an unidentified man who was accompanying the person known as Mayaguez.  (Doc. No. 23, Ex. 8.)

Trial resumed once Detective Lubiejewski obtained the statement from Ortiz.  Plaintiffs' trial counsel were provided with a copy of Ortiz's statement and were informed that he would be made available as a witness for the defense.  (Doc. No. 23, Ex. 20 at 1-18.)  The court recessed to allow Plaintiffs' trial counsel time to review Ortiz's statement and to determine a strategy for its use.  (*Id.*)  Ultimately, Plaintiffs' trial counsel decided not to call Ortiz as a defense witness.  (*Id.*)  Trial counsel offered several reasons for this decision, including their belief that Ortiz was not credible, that his testimony was unnecessary to gain an acquittal, and that offering Ortiz risked bolstering the testimony of Thompson, the prosecution's main witness.  (*Id.*)  Plaintiffs' trial counsel also made the decision not to call Sanchez at trial because Ortiz would have been called to impeach Sanchez's testimony.  (Doc. No. 23, Ex. 21 at 21-26.)

On March 29, 1988, Plaintiffs were convicted of murder and conspiracy to commit murder.  (*Id.*, Ex. 21 at 28; *id.* ¶ 160; Doc. No. 25 ¶ 160.)  They were sentenced to life in prison.

---

to the name and address of Ortiz before trial and also had reason to believe, based on Sanchez's statement, that Ortiz might have information of use to Plaintiffs' defense.  This evidence is unrebutted in the record.

The Superior Court of Pennsylvania affirmed the convictions on March 1, 1990.  (Doc. No. 23, Ex. 29 at 14-18; *id.*, Ex. 30.)  In October 2005, after Ortiz made a new statement exculpating Plaintiffs and after lie-detector tests were administered to Plaintiffs, the Court of Common Pleas of Philadelphia granted Plaintiffs a new trial.  The Philadelphia District Attorney decided not to prosecute the charges.  (Stipulation, Dec. 10, 2007, ¶¶ II-VI.)  Plaintiffs thereafter brought this action claiming that their constitutional rights were violated and that their arrest, trial, conviction, and incarceration violated state and federal law.

On January 18, 2007, we granted Defendants' motion to dismiss claims against the Philadelphia District Attorney's Office and Assistant District Attorney Rubino.[13]  (Doc. No. 13).  The remaining causes of action are a § 1983 claim against Detective Lubiejewski for malicious prosecution, a § 1983 claim against the Defendant City of Philadelphia alleging failure to train its detectives, and a Pennsylvania state law claim for malicious prosecution.  Defendants filed the instant Motion seeking summary judgment on all remaining claims.

_____

[13] The Complaint also alleges federal constitutional violations against three "John Doe" defendants.  (Compl. ¶¶ 51-53).  "Doe defendants 'are routinely used as stand-ins for real parties until discovery permits the intended defendants to be installed.'"  *Hindes v. F.D.I.C.*, 137 F.3d 148, 155 (3d Cir. 1998) (*quoting Scheetz v. Morning Call, Inc.*, 130 F.R.D. 34, 36 (E.D. Pa. 1990)).  However, "[t]he case law is clear that '[f]ictitious parties must eventually be dismissed if discovery yields no identities.'"  *Id.* (*citing Scheetz*, 130 F.R.D. at 37); *see also Guerra v. GMAC, LLC*, No. 08-1297, 2009 WL 449153, at *7 (E.D. Pa. Feb. 20, 2009) (noting same).  The Complaint asserts that two of the unknown Defendants might possibly be Detectives Dougherty and McGoin.  (Compl. ¶ 9 ("John Doe Defendants were Detectives or Police Officers  . . . including possible [sic] Detectives Dougherty and McGoin").)  Plaintiffs advance no argument and produce no evidence to substantiate the allegation that Detectives Dougherty and McGoin are the "John Doe" Defendants.  Moreover, Plaintiffs offer no evidence that would support a § 1983 claim against the "John Doe" Defendants.  Accordingly, all claims against John Doe Defendants 1-3 will be dismissed with prejudice.

II.     **LEGAL STANDARD**

      Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine

issue of material fact exists only when "the evidence is such that a reasonable jury could return a

verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of demonstrating that there are

no facts supporting the nonmoving party's legal position.  *Celotex,* 477 U.S. at 322-24.  Once the

moving party carries this initial burden, the nonmoving party must set forth specific facts

showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see also Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (explaining that the nonmoving party

"must do more than simply show that there is some metaphysical doubt as to the material facts").

When deciding a motion for summary judgment, the court must view facts and inferences in the

light most favorable to the nonmoving party.  *Anderson,* 477 U.S. at 255; *Siegel Transfer, Inc. v.*

*Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).  However, courts may not resolve

factual disputes or make credibility determinations.  *Siegel Transfer,* 54 F.3d at 1127.

      Considering the way in which Plaintiffs' counsel responded to the motion for summary

judgment, we will reiterate the duty of a non-moving party opposing a summary judgment

motion.  When a defendant moves for summary judgment, "the opponent may not rest on

allegations in pleadings, but must counter with *specific facts* which demonstrate that there exists

a genuine issue for trial."  *Orson, Inc., v. Miramax Film Corp*., 79 F.3d 1358, 1366 (3d. Cir.

1996) (*citing Celotex*, 477 U.S. at 323) (emphasis added).  A nonmoving party "cannot rely

merely upon bare assertions, conclusory allegations or suspicions" to sustain its case. *Fireman's Ins. Co. v. DeFresne,* 676 F.2d 965, 969 (3d Cir. 1982). "[A] nonmoving party must adduce more than a mere scintilla of evidence in its favor . . . and cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (*citing Anderson*, 477 U.S. at 249).

When the burden shifts to the nonmoving party, it imposes an affirmative obligation to identify the relevant evidence it has adduced. *See Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("A party seeking to defeat a motion for summary judgment is required to wheel out all its artillery to defeat it.") (internal citation and quotation omitted). A non-moving party may not merely submit a voluminous record in the hopes that a court will sift through the details in an effort to deduce some material dispute of fact. *See Herman v. City of Chi.*, 870 F.2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing."); *Carmen v. San Fran. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (noting that a "district court is not required to comb the record to find some reason to deny a motion for summary judgment"); *Morisseau v. DLA Piper*, 532 F. Supp. 2d 595, 618 (S.D.N.Y. 2008) ("Where a non-moving party defaults on a properly supported motion for summary judgment, the court is not obliged to sift through a large court record against the possibility that it will find something to warrant denial of the motion that the non-moving party has not bothered to call to its attention.").

## III.   LEGAL ANALYSIS

Plaintiffs' Complaint alleges that Defendants "deprived [them] of their rights under the 4th, 5th, 6th, 8th and 14th Amendments to the United States Constitution." (Compl. ¶¶ 49, 52.)

14

Plaintiffs appeared to refine their theory of the case in their response in opposition to Defendants'

motion to dismiss, in which Plaintiffs stated that "[t]he heart and substance of [the] complaint is

malicious prosecution," which arises under the Fourth Amendment's prohibition against illegal

search and seizure.  (Doc. No. 9 at 10.)  It appeared, therefore, that Plaintiffs intended to proceed

to trial on a § 1983 malicious prosecution theory against the individual Defendants and also

against the City of Philadelphia under *Monell v. Department of Social Services,* 436 U.S. 658

(1978).

      Now, Plaintiffs' Response to Defendants' Motion suggests that Plaintiffs believe they

have additional viable theories of constitutional liability.  (*See* Doc. No. 25 at unnumbered 10.)

They offer almost no argument in favor of these alternative theories.  The lone exception to this

failure is their suggestion – and it can be called nothing more – that Defendants are liable under

the Fourteenth Amendment for denying them police protection.  (*Id*. at unnumbered 25.)

      In addition to this peripatetic legal picture, Plaintiffs have offered extensive objections to

Defendants' proposed findings of fact but have substantiated only a handful of them with

citations to record evidence.  Moreover, the factual objections that do contain evidentiary

citations often point us to evidence that is irrelevant to the proposed finding.  Finally, Plaintiffs

have submitted numerous exhibits in opposition to summary judgment totaling some 377 pages.

These exhibits include entire depositions, their expert report, police records, and witness

statements.  (*See* Doc. No. 25, Exs. A-M.)  Standing alone, these exhibits are appropriate and

potentially useful tools for informing the Court's consideration of the arguments before it.

However, in the marked absence in Plaintiffs' brief of any meaningful citation to this evidence,

these submissions are only minimally illuminating.  In fact, such filings significantly complicate

our analysis by raising the possibility of factual disputes, and, in essence, by inviting the Court to undertake its own foray into the record to hunt for a dispute of material fact.

Federal Rule of Civil Procedure 56 does not contemplate that summary judgment motions should proceed in this manner. Civil litigation in the federal system is a process driven by the parties that places the onus on the parties to advance their cases. As framed, Plaintiffs' response to Defendants' statement of undisputed facts is not helpful. Nevertheless, we will discuss all cognizable constitutional claims that Plaintiffs appear to advance at this stage, and, as necessary, explain why Plaintiffs' factual proffers are insufficient to sustain Plaintiffs' arguments. While we have undertaken a thorough review of the evidentiary record in this matter, we reiterate that it is not the obligation of this Court to scour the record in an effort to affirmatively discover a factual dispute that Plaintiffs have not presented.

A.      **Qualified Immunity**

As an initial matter, we must determine whether Defendant Lubiejewski is entitled to qualified immunity. State officials are entitled to qualified immunity as long as their actions were objectively reasonable given the existing law and the information that they possessed at the time. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (noting that "qualified immunity shields [officers] from suit for damages if 'a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed'" (*quoting Anderson v. Creighton*, 483 U.S. 635, 641 (1987))); *McLaughlin v. Watson*, 271 F.3d 566, 571 (3d Cir. 2001) (noting that "qualified immunity" affords "protection to all but the plainly incompetent or those who knowingly violate the law" (*quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986))), *cert. denied*, 535 U.S. 989 (2002). Whether a defendant is entitled to

16

qualified immunity is, in most instances, a question of law for the court to decide.  *See Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) ("Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury."), *cert. denied*, 549 U.S. 820 (2006).  The Supreme Court has explained the purpose of the doctrine of qualified immunity, stating that "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties."  *Creighton*, 483 U.S. at 638.  "The rule supports 'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'"  *McLaughlin*, 271 F.3d at 570 (*quoting In re City of Phila. Litig.*, 49 F.3d 945, 960 (3d Cir. 1995)).

To this end, a plaintiff alleging a constitutional tort against a police officer under § 1983 must proffer more than a mere allegation of wrongdoing.  *Id.* at 571.  The test for whether qualified immunity is applicable may be properly characterized as a two-step inquiry.  *See Wright v. City of Phila.*, 409 F.3d 595, 599-601 (3d Cir. 2005) (discussing *Saucier v. Katz*, 533 U.S. 194 (2001), and noting two-step inquiry).  A court must determine:  (1) if a constitutional right has been violated, and, if so, (2) whether that right was clearly established at the time of the violation.  *Id.*; *see also Atkinson v. Taylor*, 316 F.3d 257, 261 (3d Cir. 2003) (noting the two steps).  In determining the contours of a clearly established right, the Third Circuit has stated that "[t]he essential inquiry is whether a reasonable official in the defendant's position at the relevant time 'could have believed, in light of clearly established law, that [his or her] conduct comported with established legal standards.'"  *Wright*, 409 F.3d at 599-601 (*quoting Merkle v. Upper*

17

*Dublin Sch. Dist.*, 211 F.3d 782, 797 (3d Cir. 2000)).

As to the first step, the Third Circuit has addressed the question of whether a constitutional right is violated by detectives who fail to disclose exculpatory evidence to prosecutors.  *See Yarris v. County of Del.*, 465 F.3d 129, 136 (3d Cir. 2006); *Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety*, 411 F.3d 427, 443 (3d Cir. 2005), *cert. denied*, 547 U.S. 1035 (2006).  In *Gibson*, police officers failed to disclose potentially exculpatory evidence.  441 F.3d at 443.  The Third Circuit determined that such an allegation "states an actionable § 1983 claim," noting that "[s]everal circuits have recognized that police officers and other state actors may be liable under § 1983 for failing to disclose exculpatory evidence to the prosecutor."  *Id.*  The court stated that "it would be anomalous to say that police officers are not liable when they *affirmatively conceal* material evidence from the prosecutor."  *Id.* (emphasis added).  The emphasis on intentional concealment, rather than negligent omission, is consistent with the determination by the Supreme Court that "where a government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required."  *Davidson v. Cannon*, 474 U.S. 344, 347 (1986).  Significantly, however, in *Gibson* the Third Circuit also found that before 1995 police officers were entitled to immunity if they failed to produce exculpatory evidence, because their obligation to turn over this evidence was not clearly established constitutional law until 1995, at the earliest:

> Although this Court held in *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991), that evidence in the hands of the police could be imputed to the prosecutor, the Supreme Court did not settle this matter until 1995 when it decided *Kyles v. Whitley*, 514 U.S. at 437, ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").  More importantly, the related duty of the police to disclose information to the prosecutor was not widely addressed until later.  Even in

18

> 2000, this Court was only able to assume that police officers "have an affirmative
> duty to disclose exculpatory evidence to an accused if only by informing the
> prosecutor that the evidence exists." *Smith v. Holtz*, 210 F.3d 186, 197 n.14 (3d Cir.
> 2000). Because such a right was not clearly established in this Circuit at the time of
> Gibson's conviction, Troopers Pennypacker and Reilly are entitled to qualified
> immunity with regard to their failure to inform the prosecutor of *Brady* material.

*Gibson*, 411 F.3d at 443-44. The court noted that a "prosecutor has a responsibility not just to

disclose what he or she knows but to learn of favorable evidence known to others acting on the

government's behalf." *Id.* at 443. It further noted that the "police are not equipped to perform

this role and, accordingly, the [Supreme] Court has refused to 'substitute the police for the

prosecutor, and even for the courts themselves, as the final arbiters of the government's

obligation to ensure fair trials.'" *Id.* (*quoting Kyles*, 514 U.S. at 438).

The Third Circuit confronted a similar issue in *Yarris*. *See* 465 F.3d at 141. In that case,

police officers from the Delaware County Criminal Investigation Division were accused, *inter*

*alia*, of failing to disclose potentially exculpatory physical evidence at the time of a prosecution.

*Id.* The Third Circuit found that the officers had turned over the evidence in question to the

prosecutors and therefore satisfied their obligations under *Brady v. Maryland*, 373 U.S. 83

(1963). *Id.* Consequently, they were entitled to qualified immunity. *Id.* The court cited *Gibson*,

411 F.3d at 443, and suggested that its framework for determining qualified immunity was

appropriate.

*Gibson* and *Yarris* arose out of Fourteenth Amendment Due Process claims based on the

*Brady* line of cases, which require prosecutors to disclose exculpatory evidence on request before

trial. In this case, Plaintiffs claim that Defendant Lubiejewski maliciously prosecuted them in

violation of the Fourth Amendment's prohibition of illegal search and seizure. While the

19

underlying facts differ slightly, we believe that *Gibson* provides the essential guidance necessary to our inquiry into Defendant Lubiejewski's entitlement to immunity.  Plaintiffs' malicious prosecution claim appears to hinge entirely on the contention that Defendant Lubiejewski failed to disclose exculpatory evidence to the District Attorney's Office, and that in so doing, it was he who initiated the charges brought against them.

The Third Circuit has not directly addressed the question of whether an investigating police official can be held liable under the Fourth Amendment as the initiator of a malicious prosecution.  District courts in the Eastern District of Pennsylvania have addressed this question several times, however, and each time have held that a plaintiff can only proceed against a police officer under a malicious prosecution theory if the officer "knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion."  *See, e.g.*, *Harris v. City of Phila.*, No. 97-3666, 1998 WL 481061, at *5 (E.D. Pa. Aug. 14, 1998); *see also O'Connor v. City of Phila.*, No. 05-2879, 2006 WL 1490134, at *7 (E.D. Pa. May 26, 2006), *aff'd*, 233 Fed. App'x 161 (2007) (same); *Stango v. Rodden*, No. 00-5709, 2001 WL 1175131, at *4 (E.D. Pa. Aug. 21, 2001) (same); *Garcia v. Micewski*, No. 97-5379, 1998 WL 547246, at *9 (E.D. Pa. Aug. 24, 1998) (same); *Merrero v. Micewski*, No. 96-8534, 1998 WL 414724, at *6-7 (E.D. Pa. Jul 22, 1998) ("A police officer may only be held to have 'initiated' a criminal proceeding if he knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion.").  These decisions are consistent with the conclusions of several circuit courts that have addressed the same question.  *See Reed v. City of Chi.,* 77 F.3d 1049, 1053 (7th Cir. 1996) (noting generally that "[i]t is conceivable that a wrongful arrest could be the first step towards a malicious prosecution" even though "the State's Attorney, not the

20

police, prosecutes a criminal action"); *Senra v. Cunningham,* 9 F.3d 168, 173 (1st Cir. 1993) ("If

the evidence upon which the prosecutors based the filing of the information was false, the state

prosecutors could not have exercised their discretion.  As a result, the actions of the prosecutors

would not have insulated the police officers from suit for malicious prosecution."); *Dellums v.*

*Powell*, 566 F.2d 167, 192-93 (D.C. Cir. 1977) (discussing malicious prosecution in the context

of police officers and remanding to the trial court for further development the police officer's

role in the prosecution), *cert. denied*, 438 U.S. 916 (1978).

 This position is also consistent with the Second Restatement of Torts.  The Restatement

provides, in relevant part, that:

> If . . . the information is known by the giver to be false, an intelligent exercise of the
> [public] officer's discretion becomes impossible, and a prosecution based upon it is
> procured by the person giving the false information.  In order to charge a private
> person with responsibility for the initiation of proceedings by a public official, it
> must therefore appear that his desire to have the proceedings initiated, expressed by
> direction, request or pressure of any kind, was the determining factor in the official's
> decision to commence the prosecution, or that the information furnished by him upon
> which the official acted was known to be false.

Restatement (Second) of Torts § 653, cmt. g (1977).  Thus, to have become the initiator of

Plaintiffs' prosecution under the Fourth Amendment, Defendant Lubiejewski must have

knowingly and willfully withheld exculpatory evidence from the District Attorney's Office in

such a way as to render the District Attorney's decision to proceed with the case uninformed and

therefore invalid.

 We are satisfied that Defendant Lubiejewski is entitled to qualified immunity on

Plaintiffs' malicious prosecution claim.  As noted above, the record is not conclusive as to

whether any evidence related to Maran, Raymond, Sanchez, and Ortiz obtained by the Homicide

Unit reached the District Attorney's Office.  The record is also unclear as to whether this evidence was in fact exculpatory.  Even assuming that this evidence was withheld and was exculpatory, we nonetheless find that a reasonable police officer in 1987 would not have believed that he was violating a clearly established constitutional right by failing to affirmatively hand over all evidence favorable to a suspect.  *See Gibson*, 411 F.3d at 427.  Finally, even if Defendant Lubiejewski failed to disclose exculpatory evidence, there is no evidence to support the conclusion that the failure was anything more than negligence.[14]  The jury convicted Plaintiffs based on eyewitness testimony and other evidence.  To the extent that the jury made a mistake, it was not a mistake that Defendants intentionally created.  Absent a more concrete showing of intent, Plaintiffs' claim amounts to the kind of mere allegation of wrongdoing that will not support a finding of constitutional liability.

Defendant Lubiejewski is therefore entitled to immunity with regard to Plaintiffs' malicious prosecution claim.

### B.    The Malicious Prosecution Claim

Notwithstanding our finding that Defendant Lubiejewski is entitled to qualified immunity, we will address the merits of Plaintiffs' malicious prosecution claim.  To succeed on a claim of malicious prosecution under § 1983, a plaintiff must prove that (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a

---

[14] We also note that there is no evidence to suggest that the District Attorney's Office or Assistant District Attorney Rubino acted with intent to deprive Plaintiffs of their constitutional rights.  Even though these Defendants were dismissed from this case on other grounds, it is worth noting that there is no evidence suggesting that they intentionally withheld evidence at Plaintiffs' criminal trial.

purpose other than bringing the plaintiff to justice; and (5) that the plaintiff suffered a deprivation

of liberty consistent with the concept of a seizure as a consequence of a legal proceeding.

*DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005) (*citing Albright v. Oliver*,

510 U.S. 266 (1994)); *see also Kossler v. Crisanti*,-- F.3d --, 2009 WL 1054678, at *4 (3d Cir.

Apr. 21, 2009) (*en banc*) (noting same elements).  If Plaintiffs have not proffered evidence

sufficient to create a triable issue of fact as to all five prongs, their malicious prosecution claim

must fail as a matter of law.  There are several reasons why Plaintiffs cannot sustain this claim.

        1.    *Existence of Probable Cause*

In a malicious prosecution context, a showing of probable cause requires "proof of facts

and circumstances that would convince a reasonable, honest individual that the suspected person

is guilty of a criminal offense."  *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993); *see also*

*Gatter v. Zappile,* 67 F. Supp. 2d 515, 519 (E.D. Pa. 1999) ("While the existence of probable

cause is generally a jury question, it may be appropriate for summary judgment where the

uncontroverted facts could not lead a reasonable person to find that probable cause was

lacking.") (citations omitted), *aff'd*, 225 F.3d 648 (3d Cir. 2000).  In this instance, the evidence

adduced by the District Attorney was clearly sufficient to meet this standard.  At the time of

Plaintiffs' preliminary hearings, the District Attorney's Office proffered two eyewitness

statements, both of which substantially corroborated one another and which included a positive

identification of Plaintiffs.  Both Thompson and Pescatore identified the vehicle in which

Plaintiffs were arrested as the one they saw the assailants driving at the time of the shooting.

Moreover, the identifications of both the vehicle and Plaintiffs occurred minutes after the murder

and in the vicinity of the crime scene.  The District Attorney made an independent judgment that

probable cause existed, and this judgment was buttressed when the Municipal Court found a *prima facie* case and held Plaintiffs for trial.  *See Stewart v. Abraham*, 275 F.3d 220, 229 (3d Cir. 2001) (noting that "*prima facie*" and "probable cause" are not coterminous because the "*prima facie* case standard was intended to require different and greater assurance of guilt"); *see also Commonwealth v. Cartagena*, 393 A.2d 350, 355 (Pa. 1978) (plurality opinion) (finding that probable cause had existed for the institution of criminal proceedings, though a prima facie case had not been established).  We agree with these determinations and find that probable cause clearly existed to prosecute Plaintiffs based upon the evidence available at the time of the arrests and the preliminary hearing.

We further find that even if Defendant Lubiejewski failed to disclose exculpatory evidence, this did not vitiate probable cause.  "The reasonable belief which constitutes probable cause does not require [a prosecutor] to evaluate the totality of circumstances both inculpatory and exculpatory, as a trier of fact guided by a reasonable doubt standard."  *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 251 (3d Cir. 2001) (citation omitted).  This is especially true in this instance, where the civil defendant is an investigating detective rather than a prosecutor.  As discussed above, the Third Circuit has held that "[t]he prosecutor has a responsibility . . . to learn of favorable evidence known to others acting on the government's behalf, weigh the materiality of all favorable evidence and disclose such evidence when it is reasonably probable that it will affect the result of the proceedings."  *Gibson*, 411 F.3d at 443. "The police are not equipped to perform this role."  *Id.*

For the same reasons, Plaintiffs' argument that Defendant Lubiejewski and his colleagues failed to undertake a "good faith" investigation that might have led to further exculpatory

24

evidence is unavailing.[15]  If "the law does not require that a prosecutor explore every potentially exculpatory lead before filing a criminal complaint or initiating a prosecution," *Trabal*, 269 F.3d at 251, it surely does not require a detective, on risk of civil judgment, to ensure that every potential lead is run to the ground before the District Attorney decides to file an indictment.  At any rate, Plaintiffs certainly do not point us to any authority that would support such a conclusion.

### 2.    *Initiation of Plaintiffs' Prosecution*

Plaintiffs have also failed to adduce evidence sufficient to demonstrate that Defendant Lubiejewski initiated their prosecution.  It is customarily the role of the District Attorney to determine whether a prosecution should proceed.  "In most circumstances, a plaintiff cannot proceed against a police officer for a claim of malicious prosecution because a prosecutor, not a police officer, 'initiates' criminal proceedings against an individual."  *Harris*, 1998 WL 481061, at *5 (*citing Albright*, 510 U.S. at 279 n.5 (Ginsburg, J., concurring)).  The evidence before us suggests that this custom was followed in Plaintiffs' criminal case.  Whether responsibility for initiating Plaintiffs' prosecution can be extended to Defendant Lubiejewski hinges on whether any intervening event broke the "chain of causation" between Defendant Lubiejewski and the initiation of the prosecution.  *See Garcia*, 1998 WL 547246, at *9 ("[W]here a police officer 'presents all relevant probable cause evidence to an intermediary, such as a prosecutor, . . . the intermediary's independent decision to seek a warrant . . . or to return an indictment breaks the causal chain and insulates the officer from a § 1983 claim based on lack of probable cause for an

---

[15]  Plaintiffs' Opposition brief does not provide a clear explanation of how Defendant Lubiejewski's alleged failure to undertake a "good faith" investigation affected probable cause.

arrest or prosecution."); *Rhodes v. Smithers*, 939 F. Supp. 1256, 1274 (S.D.W.V. 1995) ("[I]t is equally well established that where an officer presents all relevant probable cause evidence to an intermediary, such as a prosecutor, a grand jury, or a magistrate, the intermediary's independent decision to seek a warrant, issue a warrant, or return an indictment breaks the causal chain and insulates the officer from a § 1983 claim based on lack of probable cause for an arrest or prosecution.") (internal citation omitted), *aff'd*, 91 F.3d 132 (4th Cir. 1996).  In this case, the exercise of prosecutorial discretion by the District Attorney's Office and the Municipal Court's finding of a *prima face* case broke the chain of causation.  Defendant Lubiejewski is insulated from a § 1983 claim for malicious prosecution.

As noted earlier, Plaintiffs have failed to present evidence sufficient to create a factual dispute as to whether Defendant Lubiejewski knowingly provided false information to the District Attorney's Office.  Even assuming that Defendant Lubiejewski failed to provide evidence collected in the murder investigation to the District Attorney's Office, Plaintiffs have offered no evidence to support the proposition that he made the omission knowingly or intentionally in order to prosecute Plaintiffs.  It is true that intentional omission of evidence can be tantamount to providing false evidence.  *See, e.g.*, *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (noting that a defendant can overcome "the general presumption that an affidavit of probable cause supporting a search warrant is valid" by showing that "the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant").  However, contrary to Plaintiffs' allegations, the evidence suggests that Detective Lubiejewski and his team followed the leads obtained in the Maran, Raymond, and Sanchez statements in an effort to identify individuals who might know

26

something about Martinez's murder.  This included multiple attempts to locate and interview Sanchez and Ortiz.  Such conduct is not indicative of an intent to sweep exculpatory evidence under the rug.  A reasonable jury could not conclude otherwise.

Nothing in the record suggests that an act or omission of Defendant Lubiejewski fundamentally undermined the District Attorney's ability to intelligently exercise its prosecutorial discretion.  Plaintiffs' malicious prosecution claim fails for this additional reason.

### 3. Malice

Finally, even assuming a failure to disclose evidence that was exculpatory in nature, Plaintiffs point to no evidence suggesting that the failure was intentional or malicious.  "Malice includes both ill will in the sense of spite and the use of a prosecution for an extraneous, improper purpose."  *Russoli v. Salisbury Twp.*, 126 F. Supp. 2d 821, 871 (E.D. Pa. 2000).  As discussed above, there is no evidence that indicates malicious intent on the part of Defendant Lubiejewski.  For this additional reason, Plaintiffs cannot satisfy the malice element of a malicious prosecution claim against Defendant Lubiejewski.

## C.   Additional Theories of Liability Against Defendant Lubiejewski

### 1. Denial of Police Protection

The only other theory of constitutional liability explicitly referenced by Plaintiffs comes in passing.  While arguing against a finding of qualified immunity for Detective Lubiejewski, Plaintiffs state that:

> evidence exists that Defendant Lubiejewski and the other investigating detectives made no effort to pursue potentially exculpatory leads.  In failing to do so, the investigating detectives totally disregarded the Plaintiffs' right to police protection, and thereby violated the Plaintiffs' rights to due process and equal protection of the law, as guaranteed to them under the 14th Amendment.

(Doc. No. 25 at 27.)  This argument is frivolous.  We are aware of no cases and Plaintiffs cite

none that find a generalized "right to police protection" under either the Due Process or Equal

Protection Clauses of the Fourteenth Amendment.  Indeed, the Supreme Court and the Third

Circuit have held that there is no such right.  *See DeShaney v. Winnebago County Dep't of Social

Servs.*, 489 U.S. 189, 195 (1989) (explaining that "nothing in the language of the Due Process

Clause itself requires the State to protect the life, liberty, and property of its citizens against

invasion by private actors"); *Burella v. City of Phila.*, 501 F.3d 134, 140 (3d Cir. 2007) (finding

no constitutional right to police protection); *see also Davies v. Lehighton Police Dep't*, No. 91-

3651, 1991 WL 125895, at *1 (E.D. Pa. June 27, 1991) (noting that "there is no general

constitutional right to police protection, adequate or otherwise") (internal citation omitted); *Reiff

v. City of Phila.*, 471 F. Supp. 1262, 1265 (E.D. Pa. 1979) ("The Constitution does not explicitly

or implicitly provide a right to adequate police protection.").  To the extent that Plaintiffs present

such a claim, it must fail.

> 2.  *Fourteenth Amendment* Brady *Claim*

The facts underlying Plaintiffs' malicious prosecution argument are similar to those

typically seen in a claim under the rule in *Brady v. Maryland*, which requires the government to

disclose exculpatory evidence.  373 U.S. at 84-86.  Because Plaintiffs have offered a general

allegation that their rights were violated under the Fourteenth Amendment, we address the

applicability of *Brady* and its progeny to this case.

Under *Brady*, "the prosecution's suppression of evidence favorable to a criminal

defendant violates due process when the evidence is material to guilt or punishment."  *United*

*States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006). To establish a *Brady* violation, the defendant must demonstrate that "(1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment." *Id*. "Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985) (*citing Giglio v. United States*, 405 U.S. 154, 154 (1972)). Evidence is material under *Brady* where there is a reasonable probability that the result would have been different had the evidence been produced. *Kyles,* 514 U.S. at 434; *Bagley*, 473 U.S. at 682. Impeachment evidence is material if it might have altered the jury's judgment of the credibility of a crucial prosecution witness. *Giglio*, 405 U.S. at 154. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1976).

Defendant Lubiejewski is entitled to qualified immunity against any *Brady* claim that Plaintiffs may bring for the reasons already discussed. This is because under *Gibson*, there was no clearly established constitutional requirement that police officers take affirmative steps to disclose potentially exculpatory evidence to prosecutors until 1995, at the earliest. *See Gibson*, 411 F.3d at 427 (noting that the Supreme Court held in 1995 that prosecutors "have a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). Therefore, if Defendant Lubiejewski did fail to affirmatively disclose any potentially exculpatory evidence in 1987, he could have reasonably believed that he was acting in accordance with constitutional dictates.

In any event, Plaintiffs cannot show a *Brady* violation. The record is inconclusive on the

question of whether Defendant Lubiejewski failed to provide witness statements taken from

Maran or Raymond to the Plaintiffs' trial counsel, but there is no evidence in the record sufficient

to demonstrate that this evidence would have met *Brady*'s materiality threshold.  Materiality

requires a showing that the evidence in question might have had a significant impact on

Plaintiffs' criminal proceedings.  *See Agurs*, 427 U.S. at 109-10.  A failure to disclose will

amount to a due process violation only if the favorable evidence could reasonably be taken to put

the whole case in such a different light as to undermine confidence in the outcome of the trial.

*Smith v. Holtz*, 210 F.3d 186, 196 (3d Cir. 2000) (*quoting Kyles*, 514 U.S. at 434).  "The question

is not whether the defendant would more likely than not have received a different verdict with the

[concealed] evidence, but whether in its absence he received a fair trial, understood as a trial

resulting in a verdict worthy of confidence."  *Kyles*, 514 U.S. at 434.

　　　　Under this standard, the record fails to demonstrate that the Maran and Raymond

statements were material.  The potentially exculpatory value of these statements was in

identifying two individuals named Placedo and Jesuico, who apparently had threatened Martinez

several years before his murder.  The statements do not on their face exculpate Plaintiffs, nor do

they inculpate the two individuals named Placedo and Jesuico.  At most, they identify two

individuals who had a prior association with Martinez and who may long ago have had a motive

to harm him.  Moreover, the statements viewed in their entirety tend to establish that Placedo and

Jesuico did not perpetrate Martinez's murder.  Maran's statement suggests that Placedo and

Jesuico were older than Plaintiffs, the suspects at the time.  Pescatore's statement suggests that

Placedo and Jesuico's cars – a red Chevette and a burgundy Toyota, respectively – did not

resemble the white over blue Plymouth Scamp identified at the scene and seized by the

Philadelphia Police at the time of Plaintiffs' arrest.

Plaintiffs' trial counsel testified that had he known about Maran's statements regarding Placedo and Jesuico, he might have sought to develop this lead.[16]  (Doc. No. 23, Ex. 24 at 12-14.) Seventeen years after the fact, however, it does not appear that anyone has pursued this angle in seeking to exonerate Plaintiffs.  Rather, Plaintiffs are free today because of lie detector tests, Sanchez admitting that he lied to police during the investigation, and an exculpatory statement offered by Ortiz.  It is worth noting that following their conversations with Maran and Raymond, Defendant Lubiejewski and his colleagues in the Homicide Unit apparently determined that their most fruitful lead was to pursue Ortiz, whom they learned about from Sanchez.  But there is no evidence suggesting that supplying Plaintiffs' counsel with the identification of Placedo and Jesuico would have led to Ortiz's apprehension and exculpatory statement.  Nor is there any evidence suggesting that the statements of Maran or Raymond would have led to a different verdict at Plaintiffs' trial, which was predicated on eyewitness statements and forensic evidence. In short, the record does not suggest that the Maran and Raymond statements were material as that term is defined under *Brady* and its progeny.[17]  Therefore, to the extent that Plaintiffs assert a

_____

[16] We note that Maran and Raymond were both siblings of the decedent whose identities were easily known to Plaintiffs' trial counsel.  Any potentially useful information contained in their statements could have been obtained by Plaintiffs' counsel before trial through the exercise of reasonable diligence.  *See United States v. Pelullo*, 399 F.3d 197, 213 (3d Cir. 2005), *cert. denied*, 546 U.S. 1137 (2006) ("Our jurisprudence has made clear that *Brady* does not compel the government to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.") (citations omitted).  There is no evidence in the record before us suggesting that any such effort was undertaken.

[17] Plaintiffs may have intended to allege bad faith under *Brady*.  If so, we note that a finding of bad faith is only relevant under *Brady* when a plaintiff has alleged the failure to preserve useful evidence.  *Youngblood v. Arizona*, 488 U.S. 51, 58 (1988) (noting that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially

*Brady* claim, it must fail.

3.      *Fifth Amendment Due Process Claim*

Plaintiffs do not state a claim under the Fifth Amendment Due Process Clause, nor is there evidence in the record to support such a claim.  While certain provisions in the Fifth Amendment are applicable to the States through the Fourteenth Amendment,[18] the Due Process Clause of the Fifth Amendment applies to the federal government.  *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the due process clause of the Fourteenth Amendment prohibits the States[,] from depriving any person of property without 'due process of law.'"); *Warren v. Gov't Nat. Mortgage Ass'n*., 611 F.2d 1229, 1232 (8th Cir. 1980) (the Due Process Clause of the Fifth Amendment applies to the federal government, while the Fourteenth Amendment Due Process Clause applies to the States), *cert. denied*, 449 U.S. 847 (1980); *Martinez-Rivera v. Sanchez Ramos*, 498 F.3d 3, 8 (1st Cir. 2007) ("The Fifth Amendment Due Process Clause, however, applies 'only to actions of the federal government-not to those of state or local governments.'") (*quoting Lee v. City of L.A.*, 250 F.3d 668, 687 (9th Cir. 2001)); *see also In re Auto. Refinishing Paint*, 229 F.R.D. 482, 488 (E.D. Pa. 2005) ("The Fifth Amendment's Due Process Clause applies to the federal government . . . while the Fourteenth Amendment Due Process Clause

---

useful evidence does not constitute a denial of due process of law").  Plaintiffs have made no such allegation and have proffered no evidence to suggest that evidence relevant to their prosecution was lost or destroyed.

[18] *See, e.g.*, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964) ("We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgement by the States."); *Gideon v. Wainwright*, 372 U.S. 335 (1963) (holding the Double Jeopardy Clause of the Fifth Amendment applicable to the States).

applies to the states."). Plaintiffs assert a Fifth Amendment Due Process claim against municipal and state authorities, not federal authorities. Plaintiffs have not alleged that any federal authorities were involved in their prosecution. Accordingly, summary judgment must be granted in favor of Defendants on this claim. *See, e.g.*, *Woods-Bateman v. Hawai'i*, No. 07-0119, 2008 WL 2051671, at *16 (D. Haw. May 13, 2008) (granting summary judgment in favor of the defendants because the Due Process Clause of the Fifth Amendment is inapplicable where there is no federal defendant).

4.    *Sixth Amendment Claims*

As to the Sixth Amendment, we find nothing in the record to indicate that Plaintiffs intended to allege that they were deprived of a speedy trial; that they were not informed of the nature of the charges against him; that they were denied the right to confront their accusers; or that they were denied access to counsel. For this reason, no claim pursuant to the Sixth Amendment may proceed. *See, e.g.*, *Player v. Motiva Enters. LLC*, 240 Fed. App'x 513, 522 n.4 (3d Cir. 2007) (unpublished opinion) (noting that the plaintiff could not argue on appeal that the district court failed to consider evidence where the plaintiff "never argued . . . that there was a genuine issue of material fact" regarding the claim); *Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003) (granting summary judgment because plaintiff failed to address one of the defendant's arguments in his summary judgment motion, which resulted in the plaintiff's waiver of the opportunity to contest summary judgment on that ground).

5.    *Eighth Amendment Claims*

Similarly, Plaintiffs have advanced no specific argument nor proffered any supporting evidence to suggest that they were subjected to cruel and unusual punishment in violation of the

33

Eighth Amendment.  Therefore, no such claim can proceed to trial.  *See, e.g.*, *Player*, 240 Fed. App'x at 522 n.4 (addressing waiver of claim); *Ankele*, 286 F. Supp. 2d at 496 (same).

### D.    *Monell* Claim Against Defendant City of Philadelphia

Section 1983 does not permit suits against municipalities under theories of *respondeat superior* liability.  *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990).  In order to prevail against a municipality, § 1983 plaintiffs must prove that their constitutionally-protected rights have been violated and that the violation resulted from a municipal "custom" or "policy" of deliberate indifference to the rights of citizens.  *Monell*, 436 U.S. at 694-95; *Andrews*, 895 F.2d at 1478.  "As [the Supreme Court] recognized in *Monell* and ha[s] repeatedly affirmed, Congress did not intend municipalities to be held liable unless deliberate action attributable to the municipality directly caused a deprivation of federal rights."  *Bd. of County Commrs. of Bryan County v. Brown*, 520 U.S. 397, 415 (1997).

In this case, Plaintiffs attempt to rest their municipal liability claims on the theory that the City of Philadelphia ignored improper investigative techniques and failed to properly train its employees.  (*See* Doc. No. 25 at unnumbered 28.)  Plaintiffs' argument centers on the case of Allen Lee, a man who was exonerated fifteen years after his murder conviction when it was revealed that investigating detectives suppressed exculpatory evidence.  (*Id.*)  Defendant Lubiejewski participated in the investigations of both Allen Lee and Plaintiffs.

Plaintiffs' municipal liability claim fails for several reasons.  First, Plaintiffs have not shown any violation of their constitutional rights.  Plaintiffs cannot prove a *Monell* claim without an underlying constitutional violation.  *See Brown v. Commonwealth of Pa.*, 318 F.3d 473, 482 (3d Cir. 2003) (finding that "for there to be municipal liability, there still must be a violation of

34

plaintiff's constitutional rights"); *Rooney v. Watson*, 101 F.3d 1378 (11th Cir. 1996) (holding

that it is unnecessary to review argument of failure to train by sheriff when deputy did not violate

a constitutional right), *cert. denied*, 522 U.S. 966 (1997).

Second, to establish a successful municipal liability claim, "a plaintiff must identify the

challenged policy, attribute it to the city itself, and show a causal link between the execution of

the policy and the injury suffered." *Losch v. Borough of Parksburg*, 736 F.2d 903, 910 (3d Cir.

1984).  Plaintiffs have alleged the necessary elements, but they have failed to substantiate them

with evidence.  Indeed, the only evidence that Plaintiffs appear to proffer in support of their

municipal liability claim is a copy of the civil complaint filed by Alan Lee in 2004 and the expert

report of Dr. Williams.  (*See* Doc. No. 25 at unnumbered 28.)  The Williams report does not

create a triable dispute.  It does not show a policy or custom aimed at the suppression of

evidence.  Interestingly, the report cites Defendant Lubiejewski's deposition testimony in which

he states that "everything is turned over to the district attorney's office, whether it's inculpatory,

or exculpatory."  (Doc. No. 25-15 at 11.)  This is the opposite of a policy of suppressing

evidence.[19]  Moreover, Defendants have provided considerable evidence regarding the policies

and procedures of the Philadelphia Police Department's Homicide Division during the period of

the investigation into Martinez's murder.  (See Doc No. 23-2 ¶¶ 191-206.)  None of this evidence

suggests the existence of a policy or custom aimed at the suppression of evidence by the

---

[19] The Williams report takes issue with the specificity of the training provided to
homicide detectives.  (*See* Doc. No. 25-15 at 11.)  The report states that there was a policy within
the homicide unit to allow newly-assigned detectives to adopt the methods of veteran detectives
who mentor them.  This fact does not show a policy of suppressing exculpatory evidence.  There
is nothing in the record to suggest that the veteran detectives were using methods that advanced
such a policy.  Nor is there any evidence that a lack of more specific training amounted to or
resulted in a policy of suppressing evidence.

Philadelphia Police Department.

Finally, to establish municipal liability, Plaintiffs must "present scienter-like evidence of indifference on the part of a particular policymaker or policymakers." *Simmons v. City of Phila.*, 947 F.2d 1042, 1060-61 (3d Cir. 1991), *cert. denied*, 503 U.S. 985 (1992); *see also Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 250 (3d Cir. 2007) (noting that the plaintiffs "have the burden of showing that a government policymaker is responsible by action or acquiescence for the policy or custom"). For purposes of a *Monell* claim, a policymaker is an official who has been granted final decision-making authority concerning the relevant area in question. *LaVerdure v. County of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003) (*citing City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)). Plaintiffs have not identified such a policymaker, nor is one evident from the record.

Putting aside for a moment these legal deficiencies, Plaintiffs' *Monell* claim still fails because the presence or absence of defective investigatory policies clearly had nothing to do with the outcome at Plaintiffs' trial. Plaintiffs were convicted because two independent eyewitnesses provided corroborating accounts of what transpired on May 27, 1987. The eyewitnesses provided information to police that identified Plaintiffs as the suspects. Antonio Ortiz was available at Plaintiffs' criminal trial but Plaintiffs decided not to call him as a witness. The statements of Maran and Raymond were far from exculpatory: they identified individuals who may have intended to harm Martinez years earlier. Those individuals had since reconciled with Martinez, and Martinez had resumed dealing drugs for them. Neither of the individuals resembled Plaintiffs, the suspects identified at the scene by Thompson. Neither of them drove a car like Plaintiffs' white over blue Plymouth Scamp, also identified at the scene. If the City of

36

Philadelphia had adopted different policies – e.g., a policy of providing more specific training to homicide detectives, as advocated in the Williams report – the underlying facts here would be the same.  Plaintiffs' conviction had nothing to do with the policies of the City of Philadelphia.  It was not until 18 years later when circumstances changed that a new trial was granted.

Plaintiffs have failed to create a triable issue of fact with regard to their *Monell* claim.  Accordingly, summary judgment must be granted in Defendants' favor.

E.      **State Law Claims**

Plaintiffs' claims based on the Pennsylvania Constitution were previously dismissed because "[t]here is no private right of action for violations of the Pennsylvania Constitution similar to that provided for under § 1983."  *Domenech v. City of Phila.*, No. 06-1325, 2007 WL 172375, at *2 (E.D. Pa. Jan. 18, 2007) (*citing Farrell v. County of Montgomery*, No. 05-3593, 2006 WL 166519, at *3 (E.D. Pa. Jan. 18, 2006)).  Plaintiffs' sole remaining state law claim is for malicious prosecution.[20]  This claim is without merit.

Under Pennsylvania law, a claim of malicious prosecution requires a plaintiff to prove four of the five elements required by a federal malicious prosecution claim.  *See Kossler*, 2009 WL 1054678, at *4 n.2 (noting that "[t]he first four elements [of a federal malicious prosecution claim] are the same under Pennsylvania law"); *Donahue v. Gavin*, 280 F.3d 371, 379 (3d Cir. 2002) (excluding the deprivation of liberty element from a malicious prosecution claim under Pennsylvania law).  For the same reasons that Plaintiffs' malicious prosecution claim fails under

---

[20] Plaintiffs have withdrawn their claims for intentional infliction of emotional distress and false imprisonment.  (Doc. No. 25 at 32 (noting that "the claim for emotional distress is withdrawn"); *id.* at 31 (noting that "Plaintiffs' claims for false imprisonment were/are withdrawn").)

federal law, Plaintiffs' malicious prosecution claim fails under Pennsylvania law.  *See, e.g.*, *Warren v. Twp. of Derry*, No. 04-2798, 2007 WL 870115, at *7 n.17 (M.D. Pa. Mar. 20, 2007) (merging the plaintiffs' federal and state claims of malicious prosecution for purposes of analysis).

IV.   **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment must be granted. An appropriate Order will follow.

BY THE COURT:

_____
R. Barclay Surrick, J.